**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CRIMINAL ACTION NO. 3:21-CR-45-BJB-1**

**UNITED STATES OF AMERICA,**                                                   **Plaintiff,**

**v.**

**MICHAEL DUNN, JR.,**                                                                    **Defendant.**

### REPORT AND RECOMMENDATION

This matter is before the Court on a Motion to Suppress filed by Defendant Michael Dunn, Jr. ("Dunn"). (DN 19.) The United States filed an initial response to the Motion. (DN 21.) The Motion to Suppress was referred to the undersigned Magistrate Judge by District Judge Benjamin J. Beaton for a hearing, if necessary, and to prepare a report and recommendation. (DN 23.) The undersigned held an evidentiary hearing on October 20, 2021, and then set a deadline for the Parties to file post-hearing briefs. (DN 26.) The United States filed a post-hearing response, and Dunn filed a post-hearing reply. (DNs 30, 31.) Therefore, this matter is now ripe for review.

For the reasons stated herein, the undersigned **RECOMMENDS** that Dunn's Motion to Suppress (DN 19) be **GRANTED**.

**I.     FINDINGS OF FACT**

On May 4, 2020, Louisville Metro Police Department ("LMPD") Officer Jay Dolak ("Officer Dolak") was on patrol on his assigned beat in Smoketown, Shelby Park, and Germantown. (DN 28, at PageID # 79, 85-86.)[1] Officer Dolak was parked on Preston Street when he observed a maroon Hyundai Sonata driven by Dunn with window tint below the AS/1 line in

---

[1] The undersigned will refer to the transcript of the October 20, 2021, evidentiary hearing (DN 28) by reference to the Page ID#s found in the header placed on the transcript by the Clerk at the time of filing, not the internal page numbers of the transcript itself.

violation of Kentucky law drive past him on Preston Street and proceed to the I-65 South onramp near Arthur Street. (*Id.* at 79-80, 85-86.) Officer Dolak informed LMPD Officer Jeffrey Emerich ("Officer Emerich"), who was also on patrol that day in a separate vehicle, that he intended to stop the Hyundai Sonata, and they proceeded to conduct a traffic stop of the vehicle. (*Id.* at 79-80, 86-87; DN 19-2.) Officer Dolak testified that it was standard operating procedure to have two cars on a traffic stop and that his sole initial reason for stopping Dunn was the excessive window tint he observed. (DN 28, at PageID # 79-80, 87.) Both Officer Dolak and Officer Emerich were wearing body cameras during the stop. (DN 28, at PageID # 84-85; DNs 19-3 and 20, USA-000082.mp4 [hereinafter "Dolak Bodycam"]; DNs 19-3 and 20, USA-000083.mp4 [hereinafter "Emerich Bodycam"].)[2]

After Dunn's vehicle came to a stop, Officer Dolak approached the driver's side of Dunn's vehicle and Officer Emerich approached the passenger side. (DN 28, at PageID # 80-82, 87-88; Dolak Bodycam, at 22:44:32-22:45:35; Emerich Bodycam, at 22:38:37-22:39:43.) Officer Dolak testified that as he approach Dunn's vehicle, he saw in Dunn's lap a baggie with a knot at the bottom that was about one-and-a-half inches in length, missing the portion of the baggie below the knot, and that in his training and experience was of the type of baggie that commonly contains narcotics. (DN 28, at PageID # 81, 92-94.) He explained that the piece of baggie did not have any type of film or powder residue and that it appeared the bindle end of the baggie below the knot had been torn off. (*Id.* at 93-96.)

---

[2] The Court will refer to all bodycam footage by the internal timestamp of the recording located in the upper-right corner of the recorded video clips. Though both Officer Dolak and Officer Emerich's body camera footage begin around timestamps 22:44:32 and 22:38:37 respectively, the citation issued to Dunn, Officer Dolak's Investigative Report, and Officer Dolak's testimony during the hearing all indicate that the traffic stop occurred at approximately 18:48:00. (DNs 19-1, 19-2; DN 28, at PageID # 96-97; Dolak Bodycam, at 22:44:32; Emerich Bodycam, at 22:38:37.) Accordingly, the undersigned will presume that either the timestamp was incorrect on the body cameras or that the body cameras utilized a different time zone than Eastern Time.

He also observed a Styrofoam cup in the center console that had a dark-pinkish-colored liquid in it that he suspected to be codeine, which he testified is illegal to possess under Kentucky law.[3] (*Id.* at 81, 90-91, 95.) While at the hearing he described the substance as dark or darkish pink, his initial investigative report only identified the substance in the Styrofoam cup as "pink."[4] (DN 19-2, at PageID # 62; DN 28, at PageID # 90.) As Officer Dolak leaned down to speak with Dunn, in his body camera footage, the bottom half of a torn Styrofoam cup can be seen in the center console but the small amount of liquid or detritus at the bottom appears to be closer to black in color. (Dolak Bodycam, at 22:45:39-57.)

Prior to the stop, Officer Dolak had not seen Dunn conducting any hand-to-hand drug transactions, observed Dunn coming from a known drug house, or observed any actions by Dunn that would indicate any kind of drug activity. (DN 28, at PageID # 86-87.) Further, as he approached the vehicle, Officer Dolak did not see Dunn make any kind of furtive movements; smell any illegal substances such as marijuana; observe any pipes, needles, or rolling papers; or observe any evidence that Dunn was impaired such as slurred speech or dilated or pinpoint pupils. (*Id.* at 89-90.)

Officer Dolak greeted Dunn and asked for Dunn's driver's license, which Dunn provided to him along with the vehicle's registration. (*Id.* at 81; Dolak Bodycam, at 22:45:35-22:46:14.) Officer Dolak then asked Dunn what the baggie in his lap was and asked "What'd you do? Did you eat it?" (DN 28, at PageID # 81-82; Dolak Bodycam, at 22:46:15-23.) Dunn opened his mouth to show Officer Dolak that there was nothing in it, and Officer Dolak testified he did not

---

[3] KRS § 218A.1416(1) prohibits knowing and unlawful possession of a controlled substance classified in Schedule II, and codeine is a Schedule II substance. KRS § 218A.1416(1); 902 Ky. Admin. Regs. 55:015(2), 21 C.F.R. § 1308.12(b)(1)(i) (2020).

[4] Officer Dolak testified that upon review of his body camera footage, the substance was darker than he initially thought but that it is common in his experience for codeine to be mixed with other things such as different types of soda that would make it darker in color. (DN 28, at PageID # 95.)

see anything in Dunn's mouth. (Dolak Bodycam, at 22:46:22-25; DN 28, at PageID # 82.) Officer Dolak told Dunn to "hang tight" and returned to his vehicle to run Dunn's license through the National Crime Information Center ("NCIC") database. (Dolak Bodycam, at 22:46:37-22:47:44; DN 28, at PageID # 82.) The NCIC search showed that Dunn's license was suspended. (DN 28, at PageID # 82.)

While Officer Dolak returned to his vehicle to run Dunn's license, Officer Emerich remained at Dunn's vehicle. (Emerich Bodycam, at 22:40:37-22:41:50.) Officer Emerich watched while Dunn messed with, straightened, and rearranged the papers and other items in his vehicle, and at one point, Officer Emerich stopped Dunn from throwing an open bottle of yellow liquid out the window stating that the same would be a $1,000 fine. (*Id.*) Dunn and Officer Emerich had no other conversation while Officer Dolak was gone. (*Id.*) Neither the baggie cited by Officer Dolak nor the pink or dark pink liquid in the Styrofoam cup are visible on Officer Emerich's body camera footage from this portion of the stop though there appear to be various bits of plastic and trash in the passenger seat. (*Id.*; *id.* at 22:40:38-55.) Dunn can also be seen moving the Styrofoam cup from the center console. (*Id.* at 22:41:30-48.)

Officer Dolak testified that after learning Dunn's license was suspended, as he returned to the vehicle, he wanted to follow up on the "narcotics standpoint." (DN 28, at PageID # 82.) Immediately upon returning to Dunn's vehicle, he asked, "Mr. Dunn, there ain't nothing of whatever was in that baggie in this car, is there?" (Dolak Bodycam, at 22:47:54-59; DN 28, at PageID # 82-83.) Dunn said no but then said, "I have a gun on me. I've been shot." (Dolak Bodycam, at 22:47:59-22:48:03; DN 28, at PageID # 83.) Officer Dolak asked Dunn where the gun was in the car, and after Dunn said the gun was in the backseat, Officer Dolak asked Dunn to "hop out" of the car. (Dolak Bodycam, at 22:48:03-11; Emerich Bodycam, at 22:42:10-20; DN

4

28, at PageID # 83.) Officer Dolak asked Dunn to have a seat on the back bumper of the vehicle and then asked, "That's it? The only thing that's in there is a gun?" (Dolak Bodycam, at 22:48:18-26; Emerich Bodycam, at 22:42:21-24.) When Dunn said yes, Officer Dolak asked, "You good with me looking?" Dunn said yes, but Officer Dolak asked again, "You are? You good with me taking a look?", to which Dunn responded, "Yeah." (Dolak Bodycam, at 22:48:26-29; Emerich Bodycam, at 22:42:24-27; DN 28, at PageID # 83.) Officer Dolak proceeded to retrieve the gun, which was located under a backpack in a child's car seat in the back seat of Dunn's vehicle; while Officer Dolak did so, Dunn sat unrestrained on the trunk of his car. (Dolak Bodycam, at 22:48:29-22:49:11; Emerich Bodycam, at 22:42:27-22:43:11; DN 28, at PageID # 83-84.) After locating the gun and clearing it, Officer Dolak returned to his vehicle to run the serial number.[5] (Dolak Bodycam, at 22:49:11-22:50:57; DN 28, at PageID # 84.)

While Officer Dolak ran the gun, Officer Emerich stayed with Dunn. (Emerich Bodycam, at 22:43:53-22:44:46.) Without any prompting from Officer Emerich, Dunn stated, "I'm going down," and asked if he was going to be locked up. (*Id.* at 22:44:01-07.) Officer Emerich stated that Dunn was allowed to have a gun but then asked if Dunn was a felon. (*Id.* at 22:44:08-09.) Dunn responded that he just got off probation, to which Emerich asked, "For a felony? You're a convicted felon?" (*Id.* at 22:44:10-18.) Dunn responded, "Yeah." (*Id.* at 22:44:17-20.) Officer Emerich walked to Officer Dolak's car to inform Officer Dolak that Dunn said he was a felon. (*Id.* at 22:44:42-22:45:05; Dolak Bodycam, at 22:50:45-22:51:02; DN 28, at PageID # 84.)

---

[5] Officer Dolak initially took the gun to the hood of his car and then returned to have a brief conversation with Dunn before getting back into his cruiser to run the serial number. The conversation is largely inaudible on Officer Dolak's body camera footage but based on Officer Emerich's body camera footage, it appears that part or all of the conversation was about from where Dunn thought Officer Dolak should remember him. (Dolak Bodycam, at 22:49:33-22:50:57; Emerich Bodycam, at 22:43:30-38.)

5

After running the serial number, Officer Dolak was notified that the gun in Dunn's possession was stolen. (Dolak Bodycam, at 22:51:02-22:52:25; DN 28, at PageID # 84.) Officer Dolak returned to Dunn to place him in handcuffs, and as Officer Dolak walked toward him with the handcuffs, Dunn said, "I knew I was going to go to jail." (Dolak Bodycam, at 22:52:27-50.) Once Dunn was placed in handcuffs, Officer Dolak asked Dunn if there was anything else in the car, and Dunn said no. (*Id.* at 22:53:48-53.) Officer Dolak proceeded to search the vehicle and did not turn up any additional evidence of a crime. (Dolak Bodycam, at 22:53:54-22:55:44; DN 28, at PageID # 84.) At one point during the search, the Styrofoam cup is clearly visible on its side in the floor in front of the driver's seat, and Officer Dolak testified that at some point the cup must have gotten knocked over into the floorboard. (Dolak Bodycam, at 22:54:14; DN 28, at PageID # 91.) The baggie Officer Dolak testified that he observed is never visible on his body camera footage during the search. (Dolak Bodycam, at 22:53:54-22:55:44.) Officer Dolak confirmed that he did not take the cup, the dark pink substance, or the baggie into evidence and that he did not charge Dunn with possession of drug paraphernalia related to the baggie. (DN 28, at PageID # 90-91, 93-94; DN 19-4.)

Officer Dolak got permission from Dunn for Officer Emerich to pull Dunn's car off the interstate and into a nearby parking lot so Dunn's family could come get it later. (Dolak Bodycam, at 22:55:53-22:56:10; Emerich Bodycam, at 22:49:50-22:51:05.) Officer Dolak then put Dunn in the back of the cruiser and took him to Metro Corrections.[6] (Dolak Bodycam, at 22:57:17-23:13:22.) Officer Emerich drove away from the scene. (Emerich Bodycam, at 22:51:30-22:52:34.) At no point during the encounter did either Officer Dolak or Officer Emerich read

---

[6] During the ride to Metro Corrections, Dunn can sometimes be heard on Dolak's body camera footage making phone calls and speaking with various individuals. (Dolak Bodycam, at 22:57:17-23:13:22.)

6

Dunn his *Miranda* warnings. (Dolak Bodycam, at 22:44:33-23:13:22; Emerich Bodycam, at 22:38:37-22:52:34; DN 28, at PageID # 97.)

Officer Dolak cited Dunn for possession of a handgun by a convicted felon, receiving stolen property (firearm), excessive windshield/window tint, and operating on a suspended or revoked operator's license. (DN 19-1; DN 19-2, at PageID # 63; DN 28, at PageID # 10.) On May 11, 2021, Dunn was indicted in the Western District of Kentucky on one count of possession of a firearm by a prohibited person. (DN 1.)

## II. CONCLUSIONS OF LAW

Dunn moved the Court to suppress "any evidence directly or indirectly obtained as a result or consequence of an illegal search and seizure of his person and automobile on or about May 4, 2020," and "all statements . . . made by [Dunn] to investigating officers once he was detained." (DN 19, at PageID # 42.) Dunn argued that "the officers unconstitutionally prolonged the duration of the stop to conduct a second investigation of other criminal activity for which they lacked a reasonable suspicion."[7] (*Id.* at 46.) He also argued that because his continued seizure was unconstitutional, any statements he made must be suppressed. (*Id.* at 58-59.) In response, the United States argued that the traffic stop was not unconstitutionally prolonged because Officer Dolak had reasonable suspicion for his investigation and that Dunn's statements were admissible because they were not the result of questioning by law enforcement or custodial interrogation. (DN 30.) In his response to the United States' post-hearing brief, Dunn argued that "the single piece of knotted plastic" alone was not sufficient to support reasonable suspicion. (DN 31, at

---

[7] Dunn does not appear to challenge the reason for the initial stop of his vehicle, nor is it clear that such a challenge would have been successful given Officer Dolak's testimony that he observed a violation of KRS § 189.110. A law enforcement officer is permitted to stop a vehicle if he has probable cause to believe that a civil traffic violation has occurred. *United States v. Collazo*, 818 F.3d 247, 253-54 (6th Cir. 2016); *United States v. Torres-Ramos*, 536 F.3d 542, 550 (6th Cir. 2008); *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007). Officer Dolak's firsthand observations constituted probable cause. *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020) ("Probable cause to conduct a traffic stop is conferred where, as here, an officer observes a motorist violate a traffic law.").

PageID # 118.) Dunn also argued that his Fifth Amendment rights were violated because he was subjected to a custodial interrogation without receiving his *Miranda* warnings. (*Id.* at 119-21.) The undersigned will separately address the arguments regarding the extension of the traffic stop and suppression of Dunn's statements below.

     A.     **Extension of the Stop**

The Fourth Amendment of the United States Constitution protects citizens from unreasonable searches and seizures. U.S. Const. amend. IV. "[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth Amendment], even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). A law enforcement officer is permitted to stop a vehicle if he has probable cause to believe that a civil traffic violation has occurred, *Collazo*, 818 F.3d at 253-54; *Torres-Ramos*, 536 F.3d at 550; *Sanford*, 476 F.3d at 394, or "has a reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about to occur." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005); *United States v. Arvizu*, 534 U.S. 266, 273 (2002). However, any seizure that is lawful at its inception "can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

A traffic stop is analogous to an investigative detention and is generally governed by the principles of *Terry v. Ohio*, 392 U.S. 1 (1968). *See, e.g.*, *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). Applying those principles, the Supreme Court has held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015). "A seizure justified only by a police-observed traffic violation, therefore, 'become[s]

8

unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* at 350-51 (quoting *Caballes*, 543 U.S. at 407). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354. The Supreme Court explained that determining whether to issue a ticket and other "ordinary inquiries incident to [the traffic] stop" such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance," as well as certain officer safety related tasks, are related to the purpose of the stop and do not constitute unreasonable extensions. *Id.* at 355-56 (quoting in part *Caballes*, 543 U.S. at 408 (alternation in original)). "On-scene investigation into other crimes" is not related to the original mission of a traffic stop. *Id.* at 356. Thus, while an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop[,] . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."[8] *Id.* at 355. In other words, *Rodriguez* makes clear that in deciding whether a stop was extended, "extended" is a verb and the Court should focus on whether some action was taken by the officer that stretched or continued the stop beyond the time necessary for completing the tasks related to the traffic stop, not whether the stop was long.

The United States argued that Officer Dolak had reasonable suspicion to investigate the torn baggie and whether there were any narcotics in Dunn's vehicle. (DN 30, at PageID # 107-09.) "[R]easonable suspicion is more than an ill-defined hunch; it must be based upon 'a particularized and objective basis for suspecting the particular person . . . of criminal activity.' "

---

[8] While Dunn's reply brief cited primarily to *Rodriguez*, his initial motion relied heavily on *United States v. Everett*, 601 F.3d 484 (6th Cir. 2010). (*Compare* DN 19, at PageID # 46-47, *with* DN 31, at PageID # 114.) As the Sixth Circuit has clarified that *Rodriguez* established a "bright-line rule" that "any extension of a traffic stop absent independent reasonable suspicion is improper," *Hernandez v. Boles*, 949 F.3d 251, 256 (6th Cir. 2020), the undersigned finds any reliance on *Everett* and its reasonableness approach to determining whether a traffic stop was unreasonably extended unavailing.

9

*United States v. Shank*, 543 F.3d 309, 315 (6th Cir. 2008) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). "For an officer's suspicion to be reasonable, he 'must point to specific and articulable facts supporting his suspicion.'" *Collazo*, 818 F.3d at 257 (quoting *United States v. Perez,* 477 F. App'x. 337, 341 (6th Cir. 2012)). A court's determination of whether an officer had reasonable suspicion is based on an examination of the totality of the circumstances. *United States v. Johnson*, 620 F.3d 685, 692 (6th Cir. 2010). Here, the only facts supporting Officer's Dolak's suspicions were his observation of a torn baggie that he testified in his training and experience was of the type of baggie that commonly contains narcotics and his observation of a substance he believed to be codeine in a cup in Dunn's center console. As to the suspected codeine, the undersigned finds Officer Dolak's testimony regarding the same less than credible. Though he initially identified the substance as a pink liquid, when faced with the body camera footage that showed the substance was closer to black in color, he indicated that it was darker than he recalled and rationalized the change in color by saying that codeine is often mixed with other liquids that make it appear darker in color. Given the appearance of the liquid on the body camera footage, which almost looked more like the cup containing it had been used as an ashtray; the fact that Officer Dolak asked no questions regarding the suspected codeine; and the fact that the liquid spilled during the subsequent traffic stop without intervention by Officers Dolak or Emerich, the undersigned does not find that the suspected codeine was a particularly strong indicator of criminal activity if it was any indicator at all. As to the baggie, though Officer Dolak testified that the baggie was of the type of baggie that commonly contains narcotics, the baggie itself never appeared on the body camera footage despite the fact that numerous other pieces of trash were visible at various times. Officer Dolak also testified regarding the *absence* of many other factors that linked together with the baggie might have indicated the presence of narcotics such as the absence of any

smells attributable to illegal substances, residue on the baggie, furtive movements by Dunn, or indications that Dunn was impaired. Additionally, when asked if he swallowed the baggie's contents, Officer Dolak did not observe anything in Dunn's mouth to indicate Dunn had done so. While there are certainly innocent explanations for the existence of a torn baggie, in analyzing reasonable suspicion, "the question is not whether there is a possible innocent explanation for each of the factors, but whether all of them taken together give rise to reasonable suspicion that criminal activity may be afoot." *United States v. Marxen*, 410 F.3d 326, 329 (6th Cir. 2005). Here, when considered in combination, the undersigned finds that the baggie and the "codeine" did not give rise to reasonable suspicion sufficient to justify an investigatory detention of Dunn and instead supported at best a "hunch" regarding criminal activity.

Given the undersigned's finding regarding the lack of reasonable suspicion, the undersigned concludes that the traffic stop of Dunn was improperly prolonged as a result of Officer Dolak's "[o]n-scene investigations into other crimes." Officer Dolak testified that he stopped Dunn to investigate a window-tint violation. However, his first questions to Dunn were related to the baggie he saw when he approached Dunn's vehicle. Officer Dolak testified that even after running Dunn's license and registration and learning that Dunn had a suspended operator's license, as he returned to the vehicle, he wanted to follow up on the "narcotics standpoint," which was not the reason for which Dunn was initially stopped. These unrelated questions prolonged the stop of Dunn, admittedly by less than a minute overall, because they prevented Officer Dolak from moving on to address the window-tint violation and suspended operator's license he discovered. As noted *supra*, the *Rodriguez* case established a "bright-line rule" that "any extension of a traffic stop absent independent reasonable suspicion is improper." *Hernandez*, 949 F.3d at 256; *see also Lott*, 954 F.3d at 924. The undersigned already concluded above that Officer Dolak did not have

11

reasonable suspicion to support his questions to Dunn regarding suspected narcotics activity. Accordingly, the fact that any extension in this case was *de minimis* is not dispositive of whether the stop was prolonged. The undersigned recommends that Dunn's Motion to Suppress (DN 19) be **GRANTED** and that the Court suppress any evidence seized as a result of the unlawfully-extended stop of Dunn's vehicle.

### B.     Dunn's Statements

Dunn argued that because his statements were the product of his unconstitutional seizure, they should likewise be suppressed. (DN 19, at PageID # 58-59.) "The exclusionary rule prohibits the admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendment, as well as derivative evidence acquired as a result of an unlawful search." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Wong Sun v. United States,* 371 U.S. 471, 484-85 (1963)). This includes "verbal statements, acquired through unconstitutional means." *United States v. Akridge*, 346 F.3d 618, 623 (6th Cir. 2003). The United States argued that Dunn's statements are admissible because they were "spontaneous and not the result of in custody interrogation." (DN 30, at PageID # 109.) However, the only case cited by the United States to support its position dealt with a violation of *Miranda v. Arizona*, 384, U.S. 436 (1966), not with whether verbal statements should be excluded as the fruit of the poisonous tree. *See United States v. McConer*, 530 F.3d 484, 495 (6th Cir. 2008). Absent any argument by the United States as to whether Dunn's statements were "so attenuated as to dissipate the taint," *Akridge*, 346 F.3d at 623, or other argument regarding why Dunn's statements are admissible notwithstanding the Fourth Amendment violation found above, the undersigned recommends that Dunn's Motion to Suppress (DN 19) be **GRANTED**, and Dunn's statements be excluded as the fruit of the

poisonous tree. As the undersigned has concluded that Dunn's statements were the fruit of the poisonous tree, the undersigned does not reach Dunn's arguments regarding *Miranda*.

### III. RECOMMENDATION

For the reasons stated above, the undersigned **RECOMMENDS** that Dunn's Motion to Suppress (DN 19) be **GRANTED**.

cc: Counsel of record

### Notice

Pursuant to 28 U.S.C. § 636(b)(1)(B)-(C), the undersigned Magistrate Judge hereby files with the Court the instant findings and recommendations. A copy shall forthwith be electronically transmitted or mailed to all parties. 28 U.S.C. § 636(b)(1)(C). Within fourteen (14) days after being served, a party may serve and file specific written objections to these findings and recommendations. Fed. R. Crim. P. 59(b)(2). Failure to file and serve objections to these findings and recommendations constitutes a waiver of a party's right to appeal. *Id.; United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981); *see also Thomas v. Arn,* 474 U.S. 140 (1985).