UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                                                          NO. 3:21-CR-45-BJB

MICHAEL DUNN, JR.

\* \* \* \* \*

## MEMORANDUM OPINION & ORDER

The United States asks this Court to reject the Magistrate Judge's recommendations regarding Michael Dunn's motion to suppress evidence (DN 19). After holding an evidentiary hearing and reviewing the Report & Recommendation (DN 32), the government's objections (DN 33), and Dunn's response (DN 36), the Court sustains the government's objection and denies in part the motion to suppress.

## THE RECORD

Michael Dunn was driving through Louisville in a sedan with tinted windows. Too tinted, according to Officer Jay Dolak of the Louisville Metro Police Department. Dolak called for backup (consistent with department policy) and pulled over Dunn's car on the shoulder of Interstate 65. Hearing II Transcript (DN 38) at 9–10; Dolak Bodycam Footage (DN 19-3) at 00:51–1:05.[1] Dolak approached the car, Dunn rolled down his window, and Dolak saw "a torn-off baggie bindle" (a knotted, torn baggie) in Dunn's lap. Hearing II. Tr. at 10:11–12. Dolak also saw "in the cup holder … a Styrofoam cup," which had been torn down to a very short height, and which contained a substance that "appeared to be … syrupy." *Id.* at 11:1–5. Dolak suspected the liquid was codeine. *Id.* at 11:7. After requesting Dunn's license and registration, Dolak asked Dunn about the torn plastic: "What's in that baggie in your lap? Did you eat it?" Dolak Bodycam Footage at 1:43–1:49. Dunn responded by opening his mouth and wagging his tongue, presumably so Dolak could see that nothing from the baggie was inside his mouth. *Id.* at 1:50–1:53

Dolak returned to his cruiser and ran Dunn's license through the National Crime Information Center database. The search indicated Dunn had a suspended

---

[1] Both parties rely on body-camera footage from Officers Dolak and Emerich. Dunn attached these videos to his motion to suppress, and Dolak's testimony discusses his review of this footage. *See* DN 19-3; Hearing II Tr. at 11. Neither party disputes the authenticity of these videos, and nothing indicates they have been "doctored or altered." *Cf. Scott v. Harris*, 550 U.S. 372, 378 (2007) (relying on dash-camera video in consideration of summary-judgment motion).

1

license. Hearing II Tr. at 13:6–9.. Dolak brought the license and registration back to Dunn's open window and asked a further question: 'There ain't nothing of whatever was in that baggie in the car, was there?" Dolak Bodycam Footage at 3:23–3:26. "No," Dunn responded, "but I got a gun [unintelligible] I've been shot." *Id.* at 3:26–03:30. Dolak asked Dunn to step out of the car and to tell him where the gun was. Dunn did, and gave Dolak permission to retrieve the gun from under a backpack sitting on a carseat. *Id.* at 3:30–3:57.

While Dolak ran a search on the gun, Dunn waited outside his sedan with Dolak's partner, Officer Emerich, who had been standing outside the front passenger window throughout the traffic stop. *See* Emerich Bodycam Footage (DN 19-3). Unprompted, Dunn told Emerich that he was "going down." *Id.* at 5:25–5:27. Emerich noted that having a gun wasn't necessarily illegal, but asked whether Dunn was a felon. *Id.* Dunn admitted that he was. *Id.* Dolak "charged" Dunn with unlawful possession of the gun, but didn't charge any drug offense. Hearing II Tr. at 29.

A grand jury indicted Dunn on one count of possession of a firearm by a "prohibited person" (in this case a convicted felon). 18 U.S.C. §§ 922(g)(1), 924(a)(2). Dunn moved to suppress the gun and all statements that he made to Dolak and Emerich. DN 19. The Court referred Dunn's motion to a Magistrate Judge for the preparation of a report and recommendation. DN 23 (citing 28 U.S.C. § 636(b)(1)(B)). Magistrate Judge Lindsay held an evidentiary hearing on the motion (DN 28) and ordered both parties to file additional briefs (DNs 30 & 31). Judge Lindsay recommended granting Dunn's motion because the officers unreasonably prolonged the traffic stop without reasonable suspicion. R&R at 11.

The government objected on two grounds: the extension of the stop wasn't unreasonable and Dolak had reasonable suspicion to ask a follow-up question regarding the location of what he thought had been in the torn baggie. The response filed by Dunn's lawyer persuasively explained why the government was wrong about the length of the stop. But whether this question from Dolak was reasonable—in light of everything he perceived—remained unclear. So to facilitate de novo review of the portions of the R&R that the government objected to, 28 U.S.C. § 636(b)(1)(C), the Court held a further evidentiary hearing (DN 38).

### DUNN'S STOP AND QUESTIONING

### I. The Traffic Stop

Dunn argues the officers violated his constitutional rights by prolonging his traffic stop without reasonable suspicion. The Fourth Amendment of the U.S. Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Although the text of the Fourth Amendment doesn't mention suppression, the Supreme Court and Sixth

Circuit have interpreted it to require courts to exclude "[e]vidence that has been obtained in violation of the Fourth Amendment" in order to deter future violations. *United States v. Fisher*, 745 F.3d 200, 203 (6th Cir. 2014).

### A. Extension of the Stop

Judge Lindsay correctly rejected the position underlying the government's first objection: that Dolak did not extend the stop because he hadn't finished investigating the traffic stop when he returned from his cruiser and inquired about the contents of the baggie. Objections at 2–3. *Rodriguez v. United States* forecloses this argument: "The critical question" under *Rodriguez*, as Dunn's lawyer noted, "is not whether the [unrelated inquiry] occurs before or after the officer issues a ticket … but whether conducting the [inquiry] 'prolongs' —*i.e.*, adds time to—'the stop.'" 575 U.S. 348, 357 (2015) (quotation omitted).

Dolak's extra question, however brief, plainly added some length to the stop. It also expanded the stop's scope from potential traffic violations to potential drug crimes. This question about drugs was "[u]nrelated" to a stop regarding window tinting, or even a suspended license. *United States v. Coker*, 648 F. App'x 541, 543–44 (6th Cir. 2016); *see also Rodriguez*, 575 U.S. at 357 ("Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular.").

The government points to two Sixth Circuit precedents that it says adopt a narrower view. Objections at 4–5 (citing *United States v. Erwin*, 155 F.3d 818, 823–24 (6th Cir. 1998) and *United States v. Noble*, 762 F.3d 509, 520–21 (6th Cir. 2014)). But those decisions preceded *Rodriguez*, and the prosecutor identified no post-*Rodriguez* authority in the government's favor. To the contrary, the Sixth Circuit has interpreted *Rodriguez* to treat "[a] dog-sniff, safety measures taken to facilitate a different investigation, and *unrelated questioning*" as unrelated inquiries that extend traffic stops in a manner that must be justified by reasonable suspicion. *United States v. Lott*, 954 F.3d 919, 924 (6th Cir. 2020) (emphasis added).

Therefore the question *why*, not whether, Dolak extended the stop is the critical inquiry for resolving this motion.

### B. Reasonable Suspicion

Officers may prolong a traffic stop if they develop "reasonable suspicion of criminal activity" during a stop. *United States v. Collazo*, 818 F.3d 247, 257 (6th Cir. 2016) (quoting *Rodriguez*, 575 U.S. at 358). While reasonable suspicion requires less than probable cause, the officer must have "more than an ill-defined hunch." *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008) (quoting *Weaver v. Shadoan*, 340 F.3d 398, 407 (6th Cir. 2003)). The officer needs "a particularized and objective basis for suspecting the particular person … of criminal activity." *Id.* (quoting *Weaver*, 340 F.3d at 407). In assessing reasonable suspicion, courts examine the "totality of the

circumstances" and consider the evidence "using a common sense approach, as understood by those in the field of law enforcement." *Collazo*, 818 F.3d at 257 (quoting *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004)).

Drug paraphernalia can support an officer's reasonable suspicion and justify questioning about drugs. *See United States v. Cohen*, 593 F. App'x 196, 203 (4th Cir. 2014) ("Finally, and importantly, Cohen was found in possession of drug paraphernalia during the traffic stop."); *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (apparent "drug paraphernalia" in vehicle contributed to reasonable suspicion). Dunn argues that the torn baggie alone is not enough, under Sixth Circuit precedent, to supply reasonable suspicion: other "strong indicators of criminal conduct", such as hand-to-hand transactions, are absent here, and the baggie is "relatively minor" without those indicators. Motion at 13–14 & n.51 (citing *United States v. Townsend*, 305 F.3d 537, 542 (6th Cir. 2002)). The codeine, in his view, counts for nothing because the officers didn't investigate it, leaving Dolak with only a piece of plastic. *Id.* at 15; *see also* R&R at 10 (noting the "absence of many other factors" that might indicate drug activity).

But even assuming Dunn's reading of the caselaw is correct, his characterization of the facts is not. Several aspects of the stop supported Dolak's reasonable suspicion in asking the follow-up question. And his testimony at the Court's hearing credibly explained how that question rested on more than just a torn baggie.

*First*, the torn baggie in itself is surely significant, regardless of whether it's sufficient standing alone. Dunn's cross-examination of Dolak acknowledged as much: "[a] baggie, in your experience and training, … does constitute drug paraphernalia, correct?" Hearing II Tr. at 19:12–13. Dolak confirmed that characterization. *Id.* at 19:14. He also said he saw that torn baggie "in [Dunn's] lap." *Id.* at 10:11. According to his hearing testimony, the torn plastic baggie was knotted to create a bindle, which in Dolak's experience corresponds with how drugs are often packaged:

> So, typically, on the street, drugs are packaged in plastic baggies, and the way it's packaged is the drugs are put in the bag, and then it's twisted, and it's tied in a knot.
>
> And what was in his lap appeared to be a knotted baggie. I couldn't see what was on the other side of it. So whenever I asked him about it, and when we looked at it, the – whatever was in it had already been ripped off. The only thing left was the knotted baggie.

Hearing II Tr. at 10:15–22.

This characterization of the link between the knotted baggie and criminal activity is both inherently reasonable and consistent with other courts' consideration of similar evidence. *See, e.g.*, *United States v. Rumph*, 145 F.3d 1334, at *2 (6th Cir.

4

1998) (noting discarded "plastic bag" contributed to officer's reasonable suspicion); *United States v. Sparks*, 291 F.3d 683, 692 (10th Cir. 2002) ("Because [the officer] recognized the bags as being the 'size and type used to distribute drugs,' we believe it is reasonable to conclude that they were of an 'incriminating character.'" (internal quotation and citation omitted)); *United States v. Stigler*, No. 4:07-cr-239, 2008 WL 11429610, at *4 (S.D. Iowa Mar. 7, 2008) ("Plastic baggies are often associated with the illegal drug trade.").

*Second*, although the body-cam footage never shows us what Dolak saw in Dunn's lap, Dunn's actions and responses leading up to the challenged question were consistent with the existence of a baggie. At the suppression hearing, defense counsel referred to "a knotted piece of plastic" whose "source" was unknown or unsupported. Hearing II Tr. at 27; 31:24–32:1. But the discussion during the stop was not so generic. Dolak specifically inquired about a "baggie" (not a "piece of plastic") on two occasions, and both times Dunn responded without any confusion. *Id.* at 28. He did not respond with "Eat what?", as if he wasn't aware of any baggie, but instead "just opened his mouth and moved his tongue around to show me that it wasn't in his mouth." *Id.* at 28:8–9. This corroborates, rather than undermines, the existence of a baggie.

*Third*, Dunn's partial and nonverbal answer naturally led Dolak to wonder "what happened with that" and "if there was any more in the car." *Id.* at 14:9–14. That the contents of an empty baggie are not visible in someone's mouth doesn't mean that person didn't eat them. They weren't in what was left of the baggie; they weren't in his mouth; could they be elsewhere in the car? As Dolak explained at the hearing, when he decided to ask the follow-up question, if Dunn had denied "there was anything else that would have been in that baggie in the car," he would have asked permission to search. *Id.* at 29–30. Regardless of whether Sherlock Holmes would've investigated in the same way, Dolak's line of inquiry was certainly reasonable. And our Fourth Amendment caselaw wasn't written according to the standards of Arthur Conan Doyle; it requires only "a particularized and objective basis" for suspicion, which typically "does not present a particularly high bar." *United States v. Belakhdhar*, 924 F.3d 925, 927–28 (6th Cir. 2019).

*Fourth*, assuming more is necessary, the presence of a liquid that Dolak perceived to be a mixture of codeine and soda amounts to additional drug evidence that Dunn says is necessary to supply reasonable suspicion. *See, e.g., United States v. Blackley*, 439 F. App'x 803, 805 (11th Cir. 2011) ("the officers had at least reasonable suspicion that criminal activity was afoot at the moment when one officer … saw what he believed to be crack cocaine and plastic bags on the floor of the driver's side of the vehicle."). Dolak explained on cross-examination that although he originally recorded that the liquid was pink, its color appeared darker when he reviewed the body-camera footage. Hearing II Tr. at 11:1–5. This darker appearance, he testified, is consistent with codeine mixed with soda, which is "common" to use as

5

a mixer of sorts: "the taste of cough syrup," according to Dolak, "isn't the greatest." *Id.* at 11:20, 12:4–5.

Although codeine is a drug with legitimate pharmaceutical use, its perceived presence in a ripped Styrofoam cup in a vehicle is more consistent with illicit than medicinal use. Dunn suggests the torn cup is equally consistent with use as an ashtray, but Dolak credibly explained this is unlikely given the "cup holder ashtrays right next to it." *Id.* at 20:23–21:2. Although defense counsel questioned why Dolak didn't charge Dunn for the codeine or any drug crime, the reason is clear: by the time he arrested Dunn, he was focused on the more serious gun charge. *Id.* at 29:12–19 ("[a narcotics charge] was … a lower-level charge. In my experience in the state court, that lower-level charge gets dismissed, and it was just one of those things that we just kind of never – never really charged."). Dolak explained he didn't follow up about the suspected narcotics because he "got tunnel vision" once he found out about the gun. *Id.* at 29:3–6.[2] And Dunn has not cited any caselaw discounting uncharged conduct from a reasonable-suspicion analysis.

Instead, he relies primarily on two decisions that are readily distinguishable. In *United States v. Townsend*, the Sixth Circuit confronted far more innocent factors that purportedly supported an officer's suspicion. 305 F.3d 537, 543–45 (6th Cir. 2002). There the officer pointed to a grab-bag of ten unconnected and unconvincing factors: unusual cooperation, but also nervousness, by a driver during late-night

---

[2] Dunn challenges Dolak's credibility on the ground that the suspected codeine is darker on the body-cam footage than Dolak described in his report. *See* Dunn Post-Hearing Brief (DN 31) at 8; Investigative Report ¶ 5 ("pink"). But Dolak credibly explained that he suspected the codeine was mixed with something based on his "training and experience … as a police officer." Hearing II Tr. at 12:3–8. And he explained the substance was "syrupy" and found next to a "soda bottle," which was consistent with a mixture. *Id.* at 12:14–15. That the soda turned out to be lightly colored doesn't necessarily undermine his suspicion, which of course rests on the facts he perceived at the time, not the facts as known to us later. *See Sampson v. Village of Mackinaw City*, 685 F. App'x 407, 412 n. 1 (6th Cir. 2017) ("[R]easonable suspicion can arise from reasonable mistakes.").

Dunn also questions why Dolak did not take the cup into evidence. According to Dolak, it fell on the floor while Dunn remained in the car during the stop. *Id.* at 15:2–8. This is a fact of marginal relevance, which—despite Dunn's protests, Post-Hearing Brief at 7—could cut in favor of reasonable suspicion just as easily as it could undermine it. And Dolak's sensible explanation about not charging a lesser drug offense associated with the baggie, discussed above, applies equally to the syrupy cup.

Based on the totality of Dolak's responses as a witness during this hearing, including those regarding the suspected codeine, the Court finds Dolak's testimony credible. His characterization of the liquid's color in a police report is not a reason to doubt his testimony regarding the events (largely captured on and corroborated by video) during the stop. *Contra* Hearing II Tr. at 35–36 (defense counsel explaining that "inconsistency in testimony" about appearance of suspected codeine "make[s] you question the entire testimony").

6

travel from Chicago to Columbus in the presence of cell phones, a Bible, 25 $1- or $10-dollar bills, and food wrappers in a car driven by someone with a prior weapons charge who was not the registered owner. *Id.* The connection in Dunn's case between the baggie, unusual answer, and codeine is far tighter and more proximate to the drug trade. *See, e.g.*, *Blackley*, 439 F. App'x at 805.

Nor is this a case of suspicion resting merely on nervousness and one innocuous item, like the syringe that the Eastern District of Kentucky concluded was insufficient. *See* Dunn Post-Hearing Brief (DN 31) at 6 (quoting *United States v. Meadows*, No. 6:21-cr-27, 2021 WL 4782259, at *4–5, 9 (E.D. Ky. Oct. 13, 2021)). Dolak *did* "link" the knotted baggie to "particular criminal activity," unlike the officer in *Meadows*. *Id.* at *4. Dolak *did* "say what crime he suspected," instead of merely gesturing to the general suspiciousness of the item. *Id.* And finally, whereas the *Meadows* defendant "volunteered … an innocent explanation" for the syringe before the officer asked, Dunn failed to offer an explanation of the torn baggie even after Dolak asked him directly. *Id.*

As the Sixth Circuit has reiterated, the evidentiary standard for reasonable suspicion is "not a high bar." *United States v. Coker*, 648 F. App'x 541, 544 (6th Cir. 2016). Dolak needed only a "particularized and objective basis" for suspecting Dunn of drug activity, not absolute certainty. *See United States v. Mundy*, 591 F. App'x 320, 323 (6th Cir. 2014) (a false suspicion "does not negate the reasonableness of [an officer's] decision to stop and investigate"). By linking the knot, drug packaging, Dunn's responses, and suspected codeine, Dolak certainly offered more than "mere hunches or unsupported and passing notions." *Shank*, 543 F.3d at 315. Rather, his reasonable suspicion of drug activity justified prolonging the traffic stop to ask a follow-up question based on Dunn's earlier non-answer and Dolak's observations.

## II. Dunn's Statements

The Court's conclusion on reasonable suspicion forecloses one of Dunn's arguments to suppress his statements. *See* Motion at 17–18. But he also contends the Court must suppress all his statements to Dolak and Emerich because they did not give him a *Miranda* warning. *See id.*; Dunn Post-Hearing Brief at 9.[3] That is only partially correct. Although Dunn volunteered the initial statement about the gun when he was not in custody, the government hasn't pointed to anything that

---

[3] Judge Lindsay did not reach the *Miranda* issue because he concluded the traffic stop was unlawfully prolonged and suppressed the statements for that reason. *See* R&R at 12.

7

would save the second un-*Mirandized* statement about Dunn's prior felony conviction.

### A. Statement Revealing Gun

The Supreme Court has held that officers must offer *Miranda* warnings when a suspect is "in custody" and "subjected to interrogation." *Miranda v. Arizona*, 384 U.S. 436, 467 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 435 (2000). Custody in this context turns on "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). "[P]ersons temporarily detained pursuant to" a traffic stop are "not 'in custody' for the purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). But if the traffic stop becomes more coercive than usual, the suspect is "entitled to the full panoply of protections," including *Miranda*'s prophylactic warnings regarding their Fifth Amendment rights. *Id.*; *see also United States v. Howard*, 815 F. App'x 69, 79 (6th Cir. 2020) (no *Miranda* warnings required because stop was not "more coercive than ordinary traffic stop").

Courts evaluate "the totality of the circumstances" from the perspective of "a reasonable man in the suspect's position" to determine if a suspect is in custody. *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003) (quotation omitted). Making that determination depends on several factors:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police ... [or] acquiesced to their requests to answer some questions.

*United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998).

The protections of *Miranda* didn't yet apply when Dolak asked whether there was "anything of whatever was in that baggie in the car." Dolak Bodycam Footage at 3:24–3:30. Dunn answered "no" while sitting in the driver's seat of his car as part of what was then an ordinary traffic stop. *Id.* Dolak had pulled him over, requested his license and registration, asked about the baggie, ran a standard search using those documents, brought them back, and immediately asked his follow-up question about the baggie's contends. The only out-of-the ordinary occurrence was the initial baggie question and tongue-wagging response, which took less 10 seconds. The entire stop had lasted only a few minutes, which—consistent with precedent—suggests it was not coercive. *See Berkemer*, 468 U.S. at 437 (traffic stops are "presumptively

temporary and brief," in contrast to prolonged "stationhouse interrogation … in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek.").

Nothing about the stop to that point rebutted that presumption of noncoercion and required the officers to *Mirandize* Dunn. Dolak and Dunn spoke in a conversational and unthreatening manner. Dolak asked about the baggie to "quickly confirm or dispel the officer's suspicion of criminal activity," which the law permits. *United States v. Wright*, 220 F. App'x 417, 421 (6th Cir. 2007) (quick questioning "suggest [suspect] was not 'in custody'" for *Miranda* purposes). Emerich stood at the passenger side while Dunn sifted through his belongings in the car. Emerich Bodycam Footage at 2:04–2:10. Dunn asked if he could toss a plastic bottle onto the side of the road—a curious question to ask a cop, and one which earned a reminder that littering carries a fine. *See id.* at 2:13–2:22. No other officers were on the scene or called to come. *Contra United States v. Jimenez-Robles*, 98 F. Supp. 3d 906, 916 (E.D. Mich. 2015) (involvement of "as many as eight agents" militates in favor of custody). All this occurred on the side of the highway, in view of many other people passing by. *See Berkemer*, 468 U.S. at 438 ("importantly, the typical traffic stop is public."). Together, these facts indicate that Dunn was not in custody, and therefore did not have to receive a *Miranda* warning, when Dolak asked about the baggie and Dunn responded about the gun.

### B. Statements Regarding Felon Status

After Dunn told Dolak that a gun was in the car, Dunn agreed to exit the vehicle and wait by the car. He sat on the trunk and began to smoke. Emerich Bodycam Footage at 4:18–4:33. Then Dunn said he was "going down." *Id.* at 5:25–5:27. This was voluntary—unprompted by any question or comment from Emerich—and therefore not an interrogation that triggers *Miranda*. *United States v. Woods*, 711 F.3d 737, 740 (6th Cir. 2013) ("In the absence of a custodial interrogation, the requirement to recite *Miranda* warnings is not triggered and the analysis is at an end."). No basis exists to suppress that statement. Emerich just stood beside Dunn without engaging him in any manner.

What about Dunn's explanation that the reason he was going down was because he had been convicted of a felony? This came in response to Emerich's comment that having a gun wasn't necessarily illegal and his question whether Dunn was a felon. Dunn responded that he was. Emerich Bodycam Footage at 5:27–5:41. At that point, Officer Emerich had "interrogated" Dunn; his question about felon status, in light of the gun, was "reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Interrogation, after all, can include both "express questioning" as well as "any words or actions on the part of the police … that the police should know are reasonably likely to elicit an incriminating response." *Id.*

And by now Dunn was in custody. The stop had exceeded the scope of a typical traffic stop. *See Berkemer*, 468 U.S. at 440. Dolak directed Dunn to exit his car, and Emerich stood nearby. Emerich's question, although short, sought information regarding Dunn's felon status and, more importantly, his knowledge of that status, which directly bears on criminal conduct. *See Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019) (government must prove that defendant "knew he belonged to the relevant category of persons barred from possessing a firearm" for prosecution under 18 U.S.C. § 922(g)). And the "most important factor" of the *Miranda* analysis set forth above suggests Dunn was in custody: the officers did *not* say he was "free to leave or to refuse to answer questions." *See United States v. Martinez*, 795 F. App'x 367, 371 (6th Cir. 2019).

Against this, the government offers nothing to support its conclusory assertion that Dunn was not in custody. Since Dunn was subject to custodial interrogation, the government may not use his answer to a question not preceded by a *Miranda* warning. *United States v. Levenderis*, 806 F.3d 390, 399 (6th Cir. 2015). The Court grants his motion to suppress this response.[4]

### III. Automobile Search

Finally, Dunn argues that his consent to Officer Dolak's search of the car was invalid because the unlawfully prolonged stop tainted it or because he was not free to refuse permission. *See* Motion at 16. Because Officer Dolak had reasonable suspicion, the first ground is not a basis for excluding the gun.

As to the second reason, Officer Dolak didn't require Dunn's consent to search because Dunn had already volunteered that he had a weapon. Because "danger may arise" when weapons are present, officers may conduct "protective searches" when "specific and articulable facts" give rise to a "reasonable belief" that "the suspect is dangerous and … may gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). This applies not only to the suspect's person but extends "to the area surrounding a suspect" where he may access weapons. *Id.* And officers may conduct a protective search "even if the suspect is detained outside the vehicle." *United States v. McCraney*, 674 F.3d 614. 620 (6th Cir. 2012). After all, "if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside." *Long*, 463 U.S. at 1052.

In light of Dunn's admission, Officer Dolak had reasonable suspicion to search the vehicle and secure the weapon. Officer Dolak testified that after Dunn said he

---

[4] Other Courts have applied the inevitable-discovery doctrine to admit statements related to felon status. *See, e.g., United States v. White*, 326 F.3d 1135, 1138 (10th Cir. 2003); *United States v. Brathwaite*, 458 F.3d 376, 382 n. 7 (5th Cir. 2006). Inevitable discovery of Dunn's felon status, of course, is not the same as inevitable discovery that Dunn *knew* of his felon status. In any case, the government fails to raise this alternative basis for admission, so the Court needn't consider it.

had a gun, his focus "became to kind of get him away from the gun." Hearing I Transcript at 10:14–15. During the search, Dunn had not been arrested and stood outside the vehicle. Officer Dolak confined his search to the back seat of the vehicle, where Dunn indicated the gun was and stopped searching upon finding it. This falls comfortably within the scope of a protective search, even setting aside Dunn's statement that Dolak could search the car.

## ORDER

The Court sustains the government's Objections (DN 33) in part, grants Dunn's motion to suppress his statements in part, and denies Dunn's motion to suppress the gun (DN 19).

Benjamin Beaton, District Judge
United States District Court

March 9, 2022